UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 14-80468-CV-MIDDLEBROOKS/BRANNON

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JCS ENTERPRISES, INC. d/b/a JCS
ENTERPRISES SERVICES, INC., T.B.T.I., INC.,
JOSEPH SIGNORE, and PAUL L. SCHUMACK, II,

Defendants.

_____/

### FOURTH REPORT OF RECEIVER JAMES D. SALLAH, ESQ.

I, James D. Sallah, Esq., not individually, but solely in my capacity as the Court-appointed receiver (the "Receiver") for JCS Enterprises Inc., d/b/a JCS Enterprises Services Inc. ("JCS"), T.B.T.I., Inc. ("TBTI"), My Gee Bo, Inc. ("Gee Bo"), JOLA Enterprise Inc. ("JOLA"), and PSCS Holdings, LLC ("PSCS"), their affiliates, subsidiaries, successors, and assigns (collectively, the "Receivership Entities" or "Estate") submit this Fourth Report regarding the present status of the Estate ("Fourth Report"). Although neither the December 12, 2014 Order Reappointing me as Receiver nor the Amended Receivership Order dated April 7, 2014 (collectively, the "Receivership Order") requires me to file status reports, I believe it is prudent at this time to submit this Fourth Report to apprise the Court and all interested parties of the ongoing efforts in carrying out my court-ordered obligations.

## IMPORTANT – PLEASE READ CAREFULLY

THE STATEMENTS CONTAINED IN THIS REPORT ARE BASED ON MY INVESTIGATION CONDUCTED IN THE TIME ELAPSING FROM THE RECEIVERSHIP'S ESTABLISHMENT.  I HAVE COMPILED THIS REPORT BASED ON BOTH MY AND MY PROFESSIONALS: (1) REVIEW OF TENS OF THOUSANDS OF PAGES OF DOCUMENTS, INCLUDING EXTENSIVE FINANCIAL RECORDS; AND (2) INTERVIEWS WITH NUMEROUS INDIVIDUALS, INCLUDING EMPLOYEES, ACCOUNTANTS, LEGAL PROFESSIONALS, VENDORS, INVESTORS, FINANCIAL INSTITUTIONS, AND OTHER RELATED PERSONS.  THE FACTS AND CONCLUSIONS HEREIN MAY BE SUBJECT TO CHANGE AS MY INVESTIGATION PROGRESSES DURING THE COURSE OF THE RECEIVERSHIP.  OTHER THAN THE AMOUNTS CONTAINED IN THE BANKS AND/OR BROKERAGE INSTITUTIONS, THE VALUE OF OTHER ASSETS HAS YET TO BE DETERMINED DEFINITIVELY.  AS ADDITIONAL INFORMATION IS DISCOVERED, I INTEND TO FILE ADDITIONAL REPORTS FROM TIME TO TIME.

IN WRITING THIS REPORT, I HAVE ATTEMPTED TO BALANCE THE IMPORTANCE OF FULL AND FAIR DISCLOSURE OF MATERIAL INFORMATION WITH THE CONCERNS OF THE UNDERLYING BUSINESSES AND ASSETS INFORMATION REMAINING CONFIDENTIAL FOR COMPETITIVE REASONS.  TO THAT END, I HAVE OPTED, IN MOST CASES, TO DISCLOSE A SIGNIFICANT AMOUNT OF FINANCIAL INFORMATION AND CAUTION ANY INDIVIDUALS OR ENTITIES WHO INTENTIONALLY MISREPRESENT THE INFORMATION CONTAINED HEREIN IN AN EFFORT TO DISPARAGE THE RECEIVERSHIP ENTITIES, OR SEEK TO USE IT UNFAIRLY TO GAIN A COMPETITIVE ADVANTAGE, THAT ANY SUCH ACTION MAY HAVE SIGNIFICANT LEGAL CONSEQUENCES.

TO THE EXTENT THAT THE RECEIVERSHIP ENTITIES ARE ENGAGED IN LITIGATION, OR ARE EXPLORING POTENTIAL LAWSUITS AGAINST INDIVIDUAL OR ENTITIES, I HAVE NOT SET FORTH ALL OF THE INFORMATION SURROUNDING THESE LAWSUITS OR POTENTIAL LAWSUITS SO AS NOT TO DISCLOSE PRIVILEGED, WORK PRODUCT INFORMATION, OR LITIGATION STRATEGY.

## I.   CURRENT CASH BALANCES IN RECEIVERSHIP ESTATE ACCOUNTS

As of April 30, 2016, I have obtained the following net cash amounts, which are currently segregated into four primary Estate accounts:

| Receivership Estate Account Balances as of April 30, 2016 | |
| --- | --- |
| JCS Enterprises, Inc. | $2,375,221.77 |
| T.B.T.I., Inc. | 3,009,045.15 |
| My Gee Bo, Inc. | 931,612.57 |
| JOLA Enterprise Inc. | 618,689.22 |
| **Cash Balances in Receivership Estate Accounts** | **$6,934,568.71** |

The table above includes <u>only</u> the cash balances currently maintained in bank accounts under my control.   It excludes, among other things, tangible assets, real property, personalty, recent settlements for which I have not yet sought Court approval, and other liquid assets that are also currently under my control, or otherwise frozen as a result of the Preliminary Injunction (DE 16).[1]

In accordance with the Receivership Order and/or this Court's approval, I have also paid certain necessary expenses in carrying out my duties and responsibilities.   Specifically, the following tables reflect amounts transferred to the Estate accounts and certain disbursements paid from September 1, 2015 to April 30, 2016:

---

[1]  For example, as explained in more detail below, I have contracts, subject to Court approval, for the sale of two homes for a gross amount of $228,000.

| JCS Enterprises, Inc. – Receivership Estate Segregated Account as of April 30, 2016 | |
|---|---|
| Beginning Balance: 9/1/15 | **$2,030,341.07** |
| Receipts: 9/1/15-4/30/16 | |
| Litigation and Settlements | **298,150.00** |
| Business Asset Liquidation | **108,349.50** |
| Refunds of Security and Other Deposits | **11,417.03** |
| **Total Receipts 9/1/15-4/30/16** | **417,916.53** |
| Disbursements: 9/1/15-4/30/16 | |
| Disbursements to Other Professionals | **8,872.30** |
| Costs to Maintain Property | **59,071.05** |
| Other Expenses | **5,092.48** |
| **Total Disbursements: 9/1/15-4/30/16** | **73,035.83** |
| **Balance in JCS Enterprises, Inc. Segregated Account** | **$2,375,221.77** |

| T.B.T.I., Inc. – Receivership Estate Segregated Account as of April 30, 2016 | |
|---|---|
| Beginning Balance: 9/1/15 | **$908,093.36** |
| Receipts: 9/1/15-4/30/16 | |
| Sale of Real Estate | **1,354,526.22** |
| Litigation and Settlements | **939,613.03** |
| Other | **2,274.31** |
| **Total Receipts 9/1/15-4/30/16** | **2,183,913.56** |
| Disbursements: 9/1/15-4/30/16 | |
| Legal fees | **191,812.50[2]** |
| Coconut Creek Property Expenses | **3,649.27** |
| **Total Disbursements: 9/1/15-4/30/16** | **82,961.77** |
| **Balance in T.B.T.I., Inc. Segregated Account** | **$3,009,045.15** |

---

[2]  Legal fees constitute contingency fees that Sallah Astarita & Cox, LLC received out of the proceeds of the settlements of lawsuits that were approved by the Court.  *See* Section V for a description of such lawsuits.  Notably, Section V also contains a description of pre-suit settlements; as this Court is aware, my professionals are not working on a contingency fee basis on cases that I am able to resolve through pre-suit demands and negotiations.

| My Gee Bo, Inc. – Receivership Estate Segregated Account as of April 30, 2016 | |
|---|---|
| Beginning Balance: 9/1/15 | **$931,612.57** |
| Receipts: 9/1/15-4/30/16 | - |
| **Total Receipts 9/1/15-4/30/16** | - |
| Disbursements: 9/1/15-4/30/16 | - |
| **Total Disbursements: 9/1/15-4/30/16** | - |
| **Balance in My Gee Bo Inc. Segregated Account** | **$931,612.57** |

| JOLA Enterprises, Inc. – Receivership Estate Segregated Account as of April 30, 2016 | |
|---|---|
| Beginning Balance: 9/1/15 | **$618,689.22** |
| Receipts: 9/1/15-4/30/16 | - |
| **Total Receipts 9/1/15-4/30/16** | - |
| Disbursements: 9/1/15-4/30/16 | - |
| **Total Disbursements: 9/1/15-4/30/16** | - |
| **Balance in JOLA Enterprises, Inc. Segregated Account** | **$618,689.22** |

## II.  UPDATES ON THE FINANCIAL RECONSTRUCTION

### A.  Conclusions From the Financial Reconstruction

As explained in two Prior Reports of Receiver James D. Sallah, Esq. ("Second Report" and "Third Report") (DE 200-1) and (DE 235-1), respectively, my professionals, namely the forensic accounting firm KapilaMukamal, L.P. ("KapilaMukamal"), conducted an extensive and complex financial reconstruction of dozens of financial accounts belonging to the Receivership Entities and related third parties.  The reconstruction covered a period from December 2011 through April 30, 2014 (the "Relevant Time Period").  It included reviewing more than one thousand investor files (1,000), and records from seventy-seven (77) related financial accounts, including fifty-six (56) bank accounts, eight (8) brokerage accounts, six (6) credit card accounts, and at least seven (7) merchant accounts.  The reconstruction also involved reviewing tens of thousands of pages of

documents that I have received in response to nearly one hundred and fifty (150) subpoenas that I issued to various third-party individuals and entities.

The reconstruction, which is completed, has established that during the Relevant Time Period, the Receivership Entities received approximately $80.7 million from investors by "selling" them investment contracts in approximately 22,500 virtual kiosk machines ("VCMs" or "machines"). Of the VCMs sold, JCS and TBTI actually placed fewer than 100 VCMs at fewer than 50 different locations. During the Relevant Time Period, JCS and TBTI touted that returns on investments would be generated by advertising revenue from the VCMs. However, the financial reconstruction has evidenced that the advertising revenue was *de minimis*. My ongoing investigation indicates that repayments to investors from the Receivership Entities totaled approximately $49.7 million. The only meaningful source of funds available to the Receivership Entities from which to make these investor payments were funds received from subsequent investors, the hallmark of a Ponzi scheme.

### B. My Professionals Determined the Total Loss

Since issuing the Third Report, my forensic accountants have completed their bank reconstruction, which includes an analysis of the chargeback activity for those individuals who invested in whole, or in part, with credit cards, and matching investor names to chargebacks to the extent possible.[3] They have combined that data with the selected data from the bank reconstruction and summarized the known investor activity as follows:

---

[3] While my forensic accountants have completed their bank reconstruction, I may update the reconstruction if additional information is obtained that would be pertinent to amending it.

| Investor Type | Funds Received From Investors | Funds Paid to Investors | Net Gain (Loss) | No. of Investors |
|---|---|---|---|---|
| Net Winners | $14.9 million | $22.6 million | $7.7 million | 333 |
| Break Even | $   0.7 million | $   0.7 million | $0 | 62 |
| Net Losers | $57.2 million | $26.0 million | $(31.2 million) | 1,381 |
| Total | $72.8 million[4] | $49.3 million[5] | $(23.5 million) | 1,776[6] |

My forensic accountants have also determined the following regarding the investor type

categorized as net losers:

- Out of the 1,381 investors who were net losers, 927 lost more than 50% of their investment, or approximately $24.2 million;

- Of these 927 investors who lost more than 50% of their investment, approximately 423 lost more than 80% of their investment, or approximately $10 million; and

- Of these 423 investors who lost more than 80% of their investment, approximately 141 lost everything they invested, or approximately $1.9 million.

## III. PARALLEL CRIMINAL PROCEEDINGS

### A.  The Criminal Case Against Joseph Signore, Laura Grande (f/k/a Laura Signore), and Paul Schumack

On October 9 2015, the Government commenced its parallel criminal case against Joseph

Signore, Laura Grande (f/k/a Laura Signore), and Paul Schumack, in federal court in West Palm

---

[4]  Amount is net of approximately $8.6 million in chargebacks paid to investors before and after the Receivership commenced.

[5] Amount does not include $8.6 million in chargebacks paid to investors before and after the Receivership.

[6] KapilaMukamal previously indicated the number of investors was approximately 1,823. Since that time, KapilaMukamal has determined that certain investors invested through a business entity or under a different name. The forensic accountants have also updated the investor database to include these investors as only one name/entity.

Beach, Florida in a case styled *United States v. Signore, et al.*, Case No. 14-80081-CR-DTKH (S.D. Fla April 7, 2014) (the "Criminal Case"). On December 7, 2015, after a nearly two-month long trial, a jury returned a verdict finding: (1) Joseph Signore guilty on 34 counts of federal criminal offenses; (2) Defendant Schumack guilty on 23 counts of federal criminal offenses; and (3) Laura Grande guilty on 7 counts of federal criminal offenses. (*See* Criminal Case, DE 677-79).

The Honorable Judge Daniel T. K. Hurley, who presided over the criminal trial, sentenced each defendant, among other things, to a term of imprisonment and to pay restitution to victims in the amount of $31,080,698.73. Specifically, Judge Hurley sentenced Joseph Signore to a total of 240 months of incarceration, Paul Schumack to a total of 144 months of incarceration, and Laura Grande to a total of 84 months of incarceration. While all three defendants have filed notices of appeal, they are currently serving their respective sentences with the Federal Bureau of Prisons.

As part of the criminal parallel proceedings, in February 2016, Laura Grande and Paul Schumack both called me to testify during their sentencing hearings about their cooperation with me and my professionals concerning the recovery and/or turnover of assets. For restitution tracking purposes, Judge Hurley also ordered me to inform the Clerk of Court of any monies paid to victim investors through the approved claims process in accordance with my duties under this Court's Receivership Order.

### B. Craig Hipp's Appeal

Following his criminal conviction, Craig Hipp, a former JCS manager, filed an appeal to the United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit"). On or about

March 30, 2016, the Eleventh Circuit affirmed Mr. Hipp's criminal judgment.  Accordingly, he continues to serve his sentence with the Federal Bureau of Prisons.[7]

## IV. LITIGATION WITH DEFENDANTS IN THE INSTANT SEC ACTION

The Receivership Order provides that I may initiate actions on behalf of the Receivership Entities against those individuals or entities who received transfers of monies or other proceeds directly or indirectly traceable from investors of the Receivership Entities.  (DE 19).  Such actions may include, but are not limited to, those for disgorgement of profits, unjust enrichment, impositions of constructive trusts, and recovery and/or avoidance of fraudulent transfers under Florida Statute § 726.101, *et seq*.  *Id*.

### A.  The Signore Lawsuit

On September 10, 2015, I filed a lawsuit against Joseph Signore and Laura Grande (collectively, the "Signore Defendants") in the U.S. District Court for the Southern District of Florida (Case No. 15-CV-80946-MIDDLEBROOKS/BRANNON).  In my complaint, I contend that the Signore Defendants operated JCS and Gee Bo as a Ponzi scheme, causing JCS to make millions of dollars in payments to investors to continue the fiction that JCS's VCM machines were actually generating returns for those investors.  Among other things, I allege the Signore Defendants caused JCS to transfer monies: (a) as returns and/or redemptions to earlier investors; (b) as commission paid to agents who helped perpetuate the scheme; (c) for their own use, including diverting funds to themselves or other companies they controlled; and, (d) to vendors in order to continue to operate their scheme for the purpose of raising additional capital from potential

---

[7]  Notably, Mr. Craig Hipp was previously convicted in the Criminal Case and sentenced to, among other things, 84 months of incarceration.  He was also recently ordered to pay the same amount of restitution as his co-defendants.

and existing investors.   In short, I allege the above-referenced transfers were made almost exclusively from new investor monies or monies from existing investors.

In addition to causing JCS to become millions of dollars in debt, I contend that the Signore Defendants also used JCS and JOLA for their own personal benefit and to the detriment of the Receivership Estate.  The Complaint provides that, between 2011 and April 7, 2014, the payments that JCS and JOLA made for the Signore Defendants' benefit alone totaled nearly $4.5 million.

Based on the Signore Defendants' alleged conduct, my complaint advances claims for unjust enrichment, breach of fiduciary duty, conversion, as well as claims under various provisions of Florida's Uniform Fraudulent Transfer Act ("FUFTA").  I am also seeking that the Court impose a constructive trust and/or equitable lien in favor of the Receivership Estate for any property currently in the Signore Defendants' possession that rightfully belongs or is traceable to the Receivership Entities.

The Signore Defendants moved to dismiss my Complaint based on their contention that I did not properly serve them in accordance with Florida law.  This Court denied their motion.

On or about November 11, 2015, Ms. Grande consented to the entry of a preliminary injunction, which included an asset freeze.   On March 4, 2016, Ms. Grande also signed a consent to a final judgment as to Count II of the Complaint, approval of which is currently pending before the Court.  As part of this consent, Ms. Grande agreed to the following findings:

- She is liable for the principal sum of $2,834,849.54 plus post-judgment interest ("Principal Sum");

- To the extent that Joseph Signore is found liable for any portion of the Principal Sum, Ms. Grande shall also then be jointly and severally liable with Joseph Signore for any amount up to $2,012,626.12 of the Principal Sum; and

- The entry of an equitable lien on all of her right to, title in, and interest in two parcels of real property, including their former marital home, and/or a judgment authorizing me to initiate legal proceedings to foreclose on such properties based upon the Receivership Estate's interest in and entitlement to an equitable lien on such properties.

## B. The Schumack Lawsuit

On March 2, 2016, I filed a lawsuit against Paul and Christine Schumack (collectively, the "Schumack Defendants") in the U.S. District Court for the Southern District of Florida (Case No. 16-CV-80303-MIDDLEBROOKS/BRANNON).  In my Complaint, I contend that Paul Schumack operated TBTI as a Ponzi scheme, causing TBTI to make millions of dollars in payments to investors to continue the fiction that JCS's VCM machines were actually generating returns for those investors.  Among other things, the Complaint alleged that the Schumack Defendants caused TBTI to transfer monies: (a) as returns and/or redemptions to earlier investors; (b) as commission paid to agents who helped perpetuate the scheme; (c) for their own use, including diverting funds to themselves or other companies they controlled; and, (d) to third parties in order for Paul Schumack and Joseph Signore to continue to operate their scheme for the purpose of raising additional capital from potential and existing investors.  In short, I allege the above-referenced transfers were made almost exclusively from new investor monies or monies from existing investors.

On or about March 16, 2016, Paul Schumack signed a consent to a final judgment in the amount of $5,129,806.94 without admitting or denying any liability.   Shortly thereafter, on or about March 18, 2016, Christine Schumack consented to a final judgment as to Count I of the Complaint, jointly and severally with Paul Schumack, in the amount of $5,129,806.94, without admitting or denying any liability.   On March 24, 2016, the Court approved these consents and

ordered Final Judgments against both Paul and Christine Schumack, jointly and severally, in the amount of 5,129,806.94.  (DE 12, 13).

Notably, as discussed in my previous reports, the Schumacks voluntarily turned over the bulk of their personal assets to the Estate in September of 2014.  The Schumacks directly, and through family members, have continued to cooperate with me to identify and liquidate assets, and identify potential claims against third parties.

## V.  LITIGATION WITH THIRD-PARTIES AND RELATED SETTLEMENTS

As of April 30, 2016, I have initiated lawsuits against seventy-eight (78) individuals and/or entities, including those identified in paragraph IV, above, seeking to recover monies that they received in excess of their contributions.  While many of these actions have been settled, I describe them for the Court in summary fashion below.

### A.  *Sallah v. Davis, et al.*, Case No. 15-CV-81584-MIDDLEBROOKS/BRANNON

On November 19, 2015, I filed a lawsuit against Lascelles Davis ("Davis"), Cash Express Services, LLC ("CES"), and Alfred Tracy ("Tracy") (the "Davis Defendants") in the U.S. District Court for the Southern District of Florida (Case No. 15-CV-81584-MIDDLEBROOKS/BRANNON).   My complaint alleged that Davis, CES, and Tracy, respectively, invested in VCM contracts and received payments for those investments in excess of their investment ("Net Profit").

I brought claims against the Davis Defendants under various provisions of FUFTA and for unjust enrichment.  These were essentially clawback claims, in which I was attempting to obtain a judgment against the Davis Defendants for the monies that they received from the Receivership Entities.  I propounded discovery on the Davis Defendants, and the parties exchanged documents.

I amicably resolved the disputes with CES and Tracy through mediation on March 4, 2016, and the Court approved my settlements with CES and Tracy, and ultimately Davis, which are currently held under seal.

**B.**   ***Sallah v. Paquette, et al.*, Case No. 15-CV-81716-BLOOM**

On December 16, 2015, I filed a lawsuit against Darren Paquette, Ronald and Pennie Paquette, Richard Paquette, Anthony and Denyelle Mehfoud, and Thomas Klatt (the "Paquette Defendants") in the U.S. District Court for the Southern District of Florida (Case No. 15-CV-81716-BLOOM).   My complaint alleged that the Paquette Defendants, other than Richard Paquette, respectively, received commission payments from TBTI, which were made as compensation for their efforts in selling investments.   My complaint also alleged that the Paquette Defendants received payments from the Receivership Entities representing Net Profits.

I brought claims against the Paquette Defendants under various provisions of FUFTA and for unjust enrichment.   These were essentially clawback claims, in which I was attempting to obtain a judgment against the Paquette Defendants for the monies that they received from the Receivership Entities.   After exchanging documents with the Paquette Defendants, I amicably resolved the disputes with the Paquette Defendants through mediation on March 18, 2016, and the Court approved my settlements with the Paquette Defendants, which are currently held under seal.

**C.**   ***Sallah v. Flansburg, et al.*, Case No. 16-CV-80032-ROSENBERG/BRANNON**

On January 7, 2016, I filed a lawsuit against Jon Drew Flansburg ("Drew Flansburg"), Maria Flansburg, Jon Flansburg, Michael Dickey, D&L Investment Group, LLC ("D&L"), Dickey Enterprises, LLC ("DELLC"), Brian Dickey, James Kelly ("Kelly"), Ryan Lawrence ("Lawrence"), Clarence Martin ("Martin"), Ernst and Judith Raffaele (the "Raffaeles"), Jorge

Bustamante, Jr. ("Bustamante"), and Andrew Wright ("Wright") in the U.S. District Court for the Southern District of Florida (Case No. 16-CV-80032-ROSENBERG/BRANNON).  On January 23, 2016, I filed an Amended Complaint to add Jesse Arocha ("Arocha"), Janice Pacheco ("Pacheco"), and CYB Investment Company, Inc. ("CYB") as Parties-Defendant.  (collectively, the "Flansburg Defendants.")  On April 11, 2016, this action was transferred to this Court and is currently listed as Case No. 16-CV-80032-MIDDLEBROOKS/BRANNON.   The Amended Complaint alleges that the Flansburg Defendants received payments that represented Net Profits and that Defendants Jon Flansburg and Wright received commission payments from TBTI, which were made as compensation for their efforts in selling investments.

I brought claims against the Flansburg Defendants under various provisions of FUFTA and for unjust enrichment.  These were essentially clawback claims, in which I was attempting to obtain a judgment against the Flansburg Defendants for the monies that they received from the Receivership Entities.

After exchanging documents with Drew and Maria Flansburg, Jon Flansburg, and Kelly, I amicably resolved the disputes with Drew and Maria Flansburg, Jon Flansburg, and Kelly.  The Court approved the Settlement Agreements with Drew and Maria Flansburg, Jon Flansburg, and Kelly, which are under seal. (DE 52, 54.)

I have obtained the entry of Clerk's Defaults against Martin and Bustamante, and will be seeking the entry of Final Default Judgments against them.  On April 6, 2016, I also moved for an Order to Show Cause against Michael Dickey, D&L, and DELLC, based on the lack of an answer and the failure of D&L and DELLC to appear before the Court through counsel.  (DE 40.)  That motion is still pending before this Court.

Lawrence filed an answer to the Complaint, which included a motion to dismiss. I filed my Response in Opposition to Lawrence's Motion to Dismiss. (DE 49.) The time period for Lawrence to file a reply brief has passed, and the Motion is ripe and currently pending before this Court.

I have also exchanged documents with Wright and have scheduled a mediation with him in June 2016. In addition, I recently exchanged documents with Pacheco and CYB and am in the process of scheduling a potential mediation with both defendants. I have recently requested that additional Defendants in this action attend the mediation scheduled with Wright, Pacheco, and CBY as a means to reduce costs.

### D. *Sallah v. Insurance and Financial Health Services, Inc., et al.*, Case No. 16-CV-80035-MARRA

On January 7, 2016, I filed a lawsuit against John Marshall ("Marshall"), Insurance and Financial Health Services, Inc. ("IFHS"), Tracy Spaeth ("Spaeth"), James Christian Purdy ("Purdy"), Purdy Heritage, LLC ("Heritage"), Richard Kaufman ("Kaufman"), Diane Kaufman, Stewart Joshua Schlinsky ("J. Schlinsky"), Marc Alexander Schlinsky ("A. Schlinsky"), Producer's Edge, Inc. ("PEI"), Trevor and Heather Harbour (the "Harbours"), AKL Financial Services, Inc. ("AKL"), Alan Kaplan ("Kaplan"), and Darryl Demarco ("Demarco") (the "Marshall Defendants") in the U.S. District Court for the Southern District of Florida (Case No. 16-CV-80035-MARRA). The Complaint alleges that the Marshall Defendants received commission payments from the Receivership Entities, directly or indirectly, which were made as compensation for their efforts in selling investments and that Defendants Purdy, Heritage, Harbour, PEI, and Spaeth received payments from the Receivership Entities for their investments in VCM contracts.

I brought claims against the Marshall Defendants under various provisions of FUFTA and for unjust enrichment.  These were essentially clawback claims, in which I was attempting to obtain a judgment against the Marshall Defendants for the monies that they received from the Receivership Entities.  I amicably resolved my dispute with PEI and the Harbours and moved the Court for approval of the Settlement Agreement with them.  The Court approved the Settlement Agreement on March 10, 2016, and the Settlement Agreement is under seal for one-hundred, twenty (120) days or until the Court orders otherwise.  (DE 15, 16.)  I also amicably resolved my dispute with Spaeth and moved the Court for approval of the Settlement Agreement with him.  The Court approved the Settlement Agreement with Spaeth on May 9, 2016, and the Settlement Agreement is under seal for one-hundred, twenty (120) days or until the Court orders otherwise. (DE 30, 29.)

I have obtained the entry of Clerk's Defaults against IFHS, Kaufman, J. Schlinsky, A. Schlinsky, and Demarco and will be seeking the entry of Final Default Judgments against them. (DE 14, 18.)  After obtaining a Clerk's Default against Marshall, Marshall notified the Receiver that he had filed for bankruptcy under Chapter 7 in Case No. 6:26-bk-11748 pending in the U.S. Bankruptcy Court for the Central District of California.  As a result, the case against Marshall is stayed.

I have exchanged documents with Purdy and Heritage and have scheduled mediation with them on the same date as the mediation with Wright.

**E.  _Sallah v. Tanney, et al._, Case No. 16-CV-80399-ZLOCH**

On March 15, 2016, I filed a lawsuit against Ligia Tanney ("Tanney"), Erich Henley ("Henley"), Gregory Lowe ("G. Lowe"), and AHD Investments, LLC ("AHD") (collectively, the

"Tanney Defendants") in the U.S. District Court for the Southern District of Florida (Case No. 16-CV-80399-ZLOCH).  On April 6, 2016, I filed an Amended Complaint, adding Janet Johnson ("J. Johnson"), Wroten Enterprises, Inc. ("Wroten"), Joy Lundstrom ("J. Lundstrom"), Vanlyn LLC, d/b/a Expert ATM ("Vanlyn"), and Thomas Episcopo ("Episcopo") as Parties-Defendant.  The Amended Complaint alleges that Henley, G. Lowe, AHD, J. Johnson, Wroten, J. Lundstrom, Vanlyn, and Episcopo received commission payments from the Receivership Entities, directly or indirectly, which were made as compensation for their efforts in selling investments and that the Tanney Defendants received payments, respectively, from the Receivership Entities for their investments in VCM contracts.

I brought claims against the Tanney Defendants under various provisions of FUFTA and for unjust enrichment.  These are essentially clawback claims, through which I am attempting to obtain a judgment against the Tanney Defendants for the monies that they received from the Receivership Entities.

### F.  *Sallah v. National Strategic Corp*., et al., 16-CV-80611-MARRA

On April 19, 2016, I filed a lawsuit against National Strategic Corporation, LLC, RBS Investment Group, LLC, S Management, LLC, DAS Funding Group, LLC, Eric Chen, Longview Pediatrics, PLLC, Reservoir Acquisitions, LLC, Jerome Lahlou, Jason Ellis, Christiana Loiacano, Done Rite Roofing, Inc., Nina Campagna, Emmett Batten, Kathy Batten, Amanda Altizer, David Altizer, Derek Altizer, Harold Louis, Joseph Eastwood, Eastwood Enterprises USA, Inc., Marangely Vazquez, Grant Toney, Patrice Toney, Owen Toney, and Todd Grant (collectively, the "National Strategic Defendants") in the U.S. District Court for the Southern District of Florida (Case No. 16-CV-80611-MARRA).  The Complaint alleges that the National Strategic Defendants

received payments, respectively, from the Receivership Entities for their investments in VCM contracts.

I brought claims against the National Strategic Defendants under various provisions of FUFTA and for unjust enrichment.  These are essentially clawback claims, through which I am currently attempting to obtain a judgment against the National Strategic Defendants for the monies that they received from the Receivership Entities.

## VI. PRE-SUIT DEMANDS AND SETTLEMENTS

Since the submission of my Third Report, the Court has approved settlement agreements with individuals or entities whom I contended were profiteers.[8]  During the same time period, I entered into negotiations with additional individuals and entities that I allege profited from their investments and am currently in various stages of settlement discussions with them.

### A.  The Moulton Settlement

On June 30, 2015, I sent a demand letter to Cassidy J. Moulton, seeking the monies he received from the Receivership Entities, directly or indirectly, in excess of the monies he paid to the Receivership Entities.  On October 14, 2015, I entered into a Confidential Stipulation with Mr. Moulton wherein I agreed to release him from any claims that I could advance against him in return for a monetary settlement, subject to approval by the Court.  On November 4, 2015, the Court entered an Order approving the Moulton settlement agreement.  (DE 247.)

---

[8]  Notably, as the Court is aware, I have tried to resolve all matters on terms reasonable to the Receivership prior to filing complaints.

### B.  The Barnes-Beauregard Settlements

On August 28, 2015, I mediated a dispute with Damon and Cathy Barnes, Jeremy Barnes, and Joshua and Jennifer Beauregard, as well as their respective business entities (collectively, the "Barnes Family"), in Tampa, Florida.  The Barnes Family agreed to mediate my potential claims.

On December 4, 2015, I entered into Confidential Stipulations with Jeremy Barnes and Joshua and Jennifer Beauregard, wherein I agreed to release them from any claims that I could have advanced against them in return for a monetary settlement, subject to Court approval.  On January 10, 2016, the Court approved the settlements with Jeremy Barnes and with Joshua and Jennifer Beauregard, and the Settlement Agreements are under seal for one-hundred, twenty (120) days or until the Court orders otherwise.  (DE 274, 275.)

On April 7, 2016, I entered into a Confidential Stipulation with Damon and Cathy Barnes and C&D Enterprise, Inc., wherein I agreed to release them from any claims that I could have advanced against them in return for a monetary settlement, subject to Court approval.  On April 29, 2016, I moved the Court for approval of the settlement with Damon and Cathy Barnes and C&D Enterprise, Inc.  On May 6, 2016, the Court approved the settlement with Damon and Cathy Barnes and C&D Enterprise, Inc., and the Settlement Agreement is under seal for one-hundred, twenty (120) days or until the Court orders otherwise.  (DE 320, 321.)

### C.  The Gallina Settlement

On November 19, 2015, I sent a demand letter to Robert Gallina, seeking the monies he received from the Receivership Entities, directly or indirectly, in excess of the monies he paid to the Receivership Entities.  On December 30, 2015, I entered into a Confidential Stipulation with Mr. Gallina wherein I agreed to release him from any claims that I could advance against him in

return for a monetary settlement, subject to approval by the Court. On January 7, 2016, the Court entered an Order approving the Gallina settlement agreement. (DE 272.)

### D.  The Moxey Settlement

On January 19, 2016, following a demand letter and settlement negotiations, I entered into a Confidential Stipulation with Clint Moxey and Moxeys Machines, LLC, wherein I agreed to release them from any claims that I could advance against them in return for a monetary settlement, subject to approval by the Court. On February 9, 2016, the Court entered an Order approving the Moxey settlement agreement. (DE 288.)

### E.  The Corcoran Settlement

On April 20, 2016, I moved the Court to approve a Stipulation and Agreement ("Settlement Agreement") with Barbara Corcoran Productions, LLC; Barbara Corcoran, Inc.; and Barbara Corcoran, individually. (DE 304, 304-1, 304-2). On May 6, 2016, the Court issued an order approving the Settlement Agreement. (DE 319). My counsel and I met with Ms. Corcoran and her counsel and were in ongoing discussions for some time.  Ms. Corcoran wanted time to consider what went on at JCS particularly in light of the related criminal conviction of Craig Hipp. Ms. Corcoran proactively offered to return a significant portion of the funds that she received for the benefit of the victims of the Estate. The court-approved resolution with Ms. Corcoran was amicable. On May 6, 2016, the Court also issued an order granting my motion (DE 305) to seal portions of the Settlement Agreement for one-hundred and twenty (120) days or until the Court orders otherwise. (DE 322.).

### F.   The Carcich Settlement

On March 1, 2016, I sent a demand letter to Kenneth and Debra Carcich, seeking the monies they received from the Receivership Entities, directly or indirectly, in excess of the monies they paid to the Receivership Entities.  On April 13, 2016, I entered into a Confidential Stipulation with Kenneth and Debra Carcich wherein I agreed to release them from any claims that I could advance against them in return for a monetary settlement, subject to approval by the Court.  On May 10, 2016, the Court entered an Order approving the Carcich settlement agreement, and the Settlement Agreement is under seal for one-hundred, twenty (120) days or until the Court orders otherwise.  (DE 323, 324.)

### G.   The Petri Settlement

On March 1, 2016, I sent a demand letter to Keith and Teri Petri, seeking the monies they received from the Receivership Entities, directly or indirectly, in excess of the monies they paid to the Receivership Entities.  On May 4, 2016, I entered into a Confidential Stipulation with Keith and Teri Petri wherein I agreed to release them from any claims that I could advance against them in return for a monetary settlement and a waiver of claims against the Receiver from a third party who had invested with the Petris, subject to approval by the Court.  On May 10, 2016, the Court entered an Order approving the Petri Settlement Agreement, and the Settlement Agreement is under seal for one-hundred, twenty (120) days or until the Court orders otherwise.  (DE 323, 324.)

### H.   Future Anticipated Litigation

Since October 2015, I have caused over several dozen demand letters to be sent to individuals and/or entities that I believe received net profits, and/or should return funds to the Receivership Estate.  Accordingly, I have made demands for such monies under FUFTA, unjust

enrichment, and other related theories.  I am in various stages of settlement discussions with those individuals and/or entities, and am preparing to file lawsuits against others.[9]

## VII.  LIQUIDATION OF ACQUIRED ASSETS

### A.  The Schumack Residence

As explained in my Second Report, in early September 2014, Defendant Schumack's counsel and my attorneys negotiated an agreement whereby Defendant Schumack and his spouse voluntarily turned over the bulk of their personal assets to the Estate.  This was accomplished pursuant to a Court-approved Assignment and Assumption Agreement ("AAA") that I entered with the Schumacks on September 17, 2014 (DE 118 and 119).  The Schumack AAA included, among other things, the Schumacks' personal residence (the "House"), purchased in November 2013 for approximately $1,650,000, as well as certain contents and furnishings.  Immediately thereafter, I procured insurance for the home and its contents, hired three appraisers pursuant to federal statute, and began maintaining the 1.5 acre property.  Shortly thereafter, I listed the home for sale, with the sale conditioned on future Court approval.

Earlier this year, I engaged a real estate agent to list the House for sale, and negotiated a reduced sales commission.  In early February 2015, the House was originally listed on multiple listing services for $1,699,000.  Over the course of several months, the price was reduced to $1,599,000, after not receiving any reasonable offers, and given the uniqueness of this property and its extravagance relative to the surrounding community.

---

[9]   I will continue to send demand letters to additional individuals and entities and, if in the best interests of the Estate, initiating legal actions against them for monies they received in excess of their principal investment.

In August 2015, after having marketed the property for approximately ten (10) months, I received a cash offer of $1,425,000 to purchase the House and the personal property that was abandoned inside.  On August 14, 2015, after obtaining updated appraisals from three separate appraisers for the average amount of $1,485,000, I filed a Motion to Approve the: (1) Private Sale of Real and Personal Property Free and Clear of Liens, Claims, and Encumbrances; and (2) Form and Manner of Notice of Sale, Bidding, and Auction Procedures, with Supporting Memorandum of Law.   (DE 225).   The Court issued an Order granting this motion on August 21, 2015 (DE 227).

I fulfilled my statutory obligations to advertise the sale as set forth in 28 U.S.C. §§ 2001 and 2002 and received no overbid within the statutory required deadline.  Accordingly, the proceeds from the sale of the Home created an infusion of money for the Receivership Estate of approximately $1.35 million.[10]

**B.  The Auction of JCS's Hard Assets**

On August 21, 2015, I submitted Verified Motion for Authority to: (1) Liquidate Certain Estate Assets Free and Clear of Liens, Encumbrances and Other Interests; (2) Vacate the Premises; and (3) Move the Remaining Unsold Assets to a Separate Storage Location. (DE 228).  The Verified Motion, which was approved by this Court on October 14, 2015 (DE 236), sought permission to utilize a public auction to liquidate the bulk of JCS's hard assets that were under my control since the inception of the Receivership Estate.  I maintained custody of these items at the

---

[10] Contemporaneous with receiving the $1,425,000 offer, I was able to further negotiate a reduction in the total commissions from 4% to 2.5%, amounting to a $21,000 reduction.

former headquarters of JCS Enterprises, Inc., which was located at 15132 Park of Commerce Blvd., Suite 103, Jupiter, Florida 33478.[11]

After notice and extensive advertising, the public auction was held on November 17, 2015 by Martin Clair & Co., LLC.[12]  The auction monetized 832 lots of property, including electronics, office furnishings, VCM machines in various stages of completion, a cargo van, a Grady White fishing boat, tools, supplies, and various other items for a gross amount of approximately $118,000.  Following the auction, termination of the lease, and abandonment of the premises, the landlord agreed to return a deposit of $10,421.64 to the Receivership Estate, which JCS paid upon the inception of the lease.

## VIII. MOTION TO APPROVE SALE OF HIPP PROPERTIES

In addition to the pending motions identified above, the following motion to approve the sale of the Hipp properties is not ripe for the Court's consideration.

After arm's length negotiations and subject to Court approval, I entered into sales contracts to sell two pieces of real property free and clear of liens, claims, encumbrances and other interests, which were assigned to the Receiver by Craig Hipp.  Specifically, I received offers from private citizens to purchase residential real estate located at 3049 SW Longleaf Court, Port St. Lucie,

---

[11]  In July 2014, I consolidated Suite 102 into Suite 103 and subsequently returned Suite 102 back to the landlord in order to reduce the lease cost to the Receivership Estate by fifty percent, maintain the status quo of the premises and potential evidence for the duration of the two separate criminal trials, and in anticipation of maximizing the value of the assets at auction through negotiations with the landlord to allow an auction at the premises despite a contrary lease clause.

[12]  The Auction was conducted by Mr. Martin Claire himself, Senior Auctioneer and Appraiser, who has conducted similar auctions throughout the United States over the past 55 years.  *See* www.martinclaire.com.

Florida 34953 and 3001 SW Longleaf Court, Port St. Lucie, Florida 34953 for gross amounts of $135,000 and $93,000, respectively.  These contracts are currently pending as described below.

In March 2016, I filed motions seeking the Court's approval to sell these properties subject to notice, overbid, auction, and other procedures in accordance with Title 28, United States Code, Sections 2001 and 2002.  (DE 292, 297).  Subsequently, the Court issued orders granting my motions subject to contractual conditions, statutory requirements, and future confirmation hearings.  (DE 301, 303).  In turn, I noticed the potential sales in the *TCPalm* newspaper and on the Receivership website at www.jcs-tbtireceivership.com.  While I am seeking additional qualified bidders, I have not received any additional bids to date.  The Court has set hearings to confirm both sales contracts on June 1, 2016 at 1:15 p.m. at the United States District Court at 70l Clematis Street, Second Floor, Courtroom 7, West Palm Beach, Florida. (*Id*.).  In the event that I receive additional qualified bidders, I will notify the Court accordingly and determine whether to seek to adjourn the sales confirmation hearings.

## IX. OTHER SIGNIFICANT EVENTS

### A.  The Claims Process

Before the end of the summer, I anticipate submitting a motion with the Court wherein I will seek approval from the Court to (1) adopt a procedure to administer claims and proof of claim form, (2) establish a deadline for filing proofs of claim, and (3) permit notice by mail and publication.  For the last several months, my Staff has been reaching out to hundreds investors and other creditors to ensure that I have updated contact information for such individuals and entities.

### B.  Efforts to Recover Monies from Taxing Authorities

Shortly after my appointment as Receiver, I learned that during 2013, TBTI remitted $500,000 to the Department of the Treasury for the benefit of Paul and Christine Schumacks' purported income tax liability.  TBTI also remitted $173,353 in payroll taxes to the various taxing authorities associated with the monies that were paid to the Schumack and previously categorized as "wages."  Similarly, I learned that JCS paid $54,600 to the State of Florida Department of Revenue during 2013.

### 1.  Federal Income Tax

Soon after discovering the payments, my counsel contacted the Internal Revenue Service ("IRS") with notification of the Temporary Restraining Order (DE 16) with its incorporated Asset Freeze, and the Preliminary Injunction Against Joseph Signore and Paul L. Schumack II with its incorporated Asset Freeze (DE 47).

As the Court is aware, subsequent to my counsel serving the IRS with a copy of the Temporary Restraining Order ("TRO")  and Asset Freeze, my forensic accountants produced an Expert Report describing the nature of the fraudulent investment scheme (*i.e.*, Ponzi Scheme), which I attached to my Second Report to this Court (DE 200-1).  Additionally, evidence offered in two criminal trials of the four separate individual defendants during 2015 further established and verified, through the juries' guilty verdicts, that the principals of JCS and TBTI operated a Ponzi scheme throughout the term of their respective operations.  Accordingly, I have recently filed amended 2013 and 2014 tax returns for TBTI that corrected the inaccurate portrayal of the monies received by the Schumacks as income.

### 2.  Federal Payroll Taxes

Further, it is my position that the payroll taxes associated with the prior income the Schumacks reported are also subject to reversal due to the findings of my forensic accountants, along with the juries' findings during two separate criminal trials involving four defendants.  Thus, I have instructed my tax accounting professionals to file the necessary forms with the various taxing authorities to attempt to secure a refund of payroll taxes previously paid by TBTI into the Receivership Estate for the benefit of the Receivership Estate.

### 3.  Florida Department of Revenue – Request for Refund of "Sales" Tax

Since on or about November 25, 2014, my professionals have been attempting to obtain a refund of $54,600 that JCS paid as purported "sales" taxes in 2013 to the Florida Department of Revenue ("FDOR").  Through correspondence, my professionals have provided the FDOR with extensive documentation reflecting my position that, for numerous reasons, certain monies that JCS paid to the FDOR in 2013 as part of a Ponzi scheme should be returned to the Receivership Estate.

Despite my position that the Estate should be refunded these monies for an eventual court-approved distribution to victim-investors, on April 25, 2016, the FDOR issued my counsel a letter continuing to deny the requested refund.  In response, I am contemplating all legal remedies that are available against the FDOR in an attempt to maximize the amount of funds in the Receivership Estate.

## X.  CONCLUSION

In conclusion, I am continuing to carry out my directives under the Receivership Order.  I plan to submit additional status reports from time to time, and the facts and conclusions in this

Fourth Report are subject to change as my investigation progresses during the course of the Receivership.

Executed on this 19th day of May 2016.

Respectfully submitted.

/s/ James D. Sallah

James D. Sallah, Esq.,
Not individually, but solely in my capacity as Receiver of JCS Enterprises, Inc. d/b/a JCS Enterprises Services, Inc., T.B.T.I., Inc., JOLA Enterprise, Inc., PSCS Holdings, LLC, and My Gee Bo, Inc.